IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 15, 2020

**NICHOLAS GRIFFIN v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2013-A-713     Steve R. Dozier, Judge**

_____

**No. M2019-00971-CCA-R3-PC**

_____

Petitioner, Nicholas Griffin, appeals the denial of his post-conviction petition. The post-conviction proceeding attacked his conviction of second degree murder with a Range II sentence of 26 years pursuant to a negotiated plea agreement. Petitioner argues that his guilty plea was not knowingly and voluntarily entered. Petitioner asserts he was denied effective assistance of counsel when his trial counsel failed to adequately prepare for trial and failed to file a motion to suppress the recordings of his jail calls with his mother. Petitioner further argues that trial counsel and his mother pressured him into accepting the guilty plea. Following a review of the briefs of the parties and the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR. and TIMOTHY L. EASTER, JJ., joined.

Kevin Kelly, Nashville, Tennessee, for the appellant, Nicholas Griffin.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Guilty Plea Submission Hearing*

The facts of this case as set forth by the State at Petitioner's guilty plea submission hearing are as follows:

[O]n October 26, 2012, the victim in this case, Mr. Henry Willy Moore, worked as a taxi[ ]cab driver for the company Yellow Cab. He was a 69[-] year old gentleman. He - - on that particular morning, in the early morning hours, was dispatched to a call for service. He was driving cab number 61.

He received that call from dispatch and he proceeded to the area of 10th Avenue North and Garfield Street here in Davidson County. The telephone number that called - - that made that telephone call for service was 615-600-9287.

On Mr. Moore's arrival, [Petitioner] appeared on the scene of 10th Avenue North and Garfield Street as well as possible other individuals. Those individuals tried to rob Mr. Moore. Mr. Moore hit the gas of the vehicle attempting to drive away and someone fired a single gunshot at Mr. Moore. The gunshot entered Mr. Moore's right upper extremity passing through his chest and exiting the left side of his body, exiting out of the vehicle. The projectile was not able to be recovered.

Based on the gunshot wound that he sustained, Mr. Moore - - Mr. Moore dies as a result of that. The medical examiner indicated that he may have been able to take one or two breaths after the gun shot. He did hit the gas of the vehicle and wrecked at the side of a church approximately half a block to a block away from the shooting.

Police responded to the scene quickly and crime scene tape was put up. The scene was processed. A single shell casing, nine millimeter shell casing was recovered at the scene of the shooting.

Sometime after the shooting, Detective Mosley, who knew [Petitioner], received a call from [Petitioner]. [Petitioner] advised Mr. Mos[le]y that he had information about who was involved in the shooting that occurred on 10th Avenue North from the telephone number. [Petitioner] had called Mr. Mosley from the same telephone number, the 600-9287 number previously referenced, that had called the taxi to the scene.

Detectives attempted to meet with [Petitioner] and gather some more information about the shooting. [Petitioner] did not show up at the locations that detectives tried to meet him and then ceased contact with detectives.

On October 31st, 2012, [Petitioner] was arrested. Shortly after he was placed in custody, he made several phone calls to family and friends. In

those calls, he placed himself at the scene of the homicide. Additionally, there was a witness, a Derrick Bailey, who was questioned a couple of weeks after the shooting. Mr. Bailey advised police that [Petitioner] showed [Mr.] Bailey the weapon that was used to shoot Mr. Moore and kill him. And he showed him that - - [Petitioner] showed Mr. Bailey that weapon several hours after the killing.

[Mr.] Bailey then helped [Petitioner] find a buyer for the gun. The weapon that [Petitioner] showed Mr. Bailey was a nine millimeter Luger semi-automatic pistol that was a very distinctive looking weapon. A few days after the homicide, [Petitioner] was able to meet with another gentleman named Thomas Dixon who [Petitioner] sold the weapon to. Mr. Dixon kept the weapon for several months before advising detectives that he had the weapon used in the Henry Moore shooting.

Police retrieved the weapon and sent that weapon that did match the description they had been given of the weapon, that being a distinctive looking nine[-]millimeter semi-automatic weapon. They sent that weapon to the Tennessee Bureau of Investigation for comparison analysis against the single nine[-]millimeter shell casing recovered from the scene. It was determined after analysis that that casing recovered at the scene of the shooting was fired from the nine[-]millimeter Luger handgun that [Petitioner] showed Mr. Bailey and that [Petitioner] ultimately sold to Mr. Dixon.

*Post-Conviction Hearing*

At the post-conviction hearing, Petitioner testified that the first attorney who represented him, who will be referred to as "initial counsel," discussed the case with him, provided him with a copy of discovery, and explained the nature of the charges, possible punishment, and different theories of guilt for premeditated murder versus felony murder. Initial counsel filed a successful motion to suppress Petitioner's statement to police.

Trial counsel took over Petitioner's case in February 2015 after the trial date had been set. The trial was later reset for August 2015 in order for trial counsel to prepare. Petitioner testified that trial counsel told him that there was a "good chance" of an acquittal if the case went to trial. However, approximately two weeks prior to the August trial date, the State provided trial counsel with recordings from the jail of phone calls between Petitioner and his mother. Thereafter, trial counsel's outlook on the case changed. Petitioner testified that initial counsel did not know about the calls so they were not included in his suppression motion. He said that trial counsel "stated in his memo that he wrote that when he got the case, [there] was a lot of evidence that was missing. . . including phone calls - - including ballistics that was missing out of the motion to

- 3 -

discover, which I didn't know about." Petitioner testified that the jail phone calls were illegally obtained and would not have existed but for his arrest and his statements which were suppressed. Petitioner testified that he requested trial counsel to file a motion to suppress the jail phone calls. However, trial counsel told him that it was too late to file the motion. Petitioner remembered that there was an automated voice at the beginning of the jail calls stating that all jail calls are recorded. However, Petitioner said that he was not thinking clearly about that while talking to his mother from the jail.

Petitioner testified that trial counsel advised him of a plea offer for thirty or thirty-five years. Petitioner did not want to accept the offer but said that he would accept a fifteen-year offer. However, he never heard anything else from trial counsel about the offer. Petitioner did not feel that trial counsel was prepared for trial, and they did not discuss what Petitioner's testimony would be or if he would testify at trial. Petitioner testified that he told trial counsel that he wanted his mother to testify on his behalf, but trial counsel told him that his mother was going to testify for the State. He said that trial counsel also told him that Derrick Bailey was going to testify against him, which Petitioner claimed he later learned was untrue.

Petitioner testified that he and trial counsel discussed what the potential outcomes of trial would be, and Petitioner insisted that he still wanted to go to trial. Petitioner testified that closer to the trial date, trial counsel informed him of another plea offer from the State. Trial counsel also told him that the prosecutor would not accept any offer for less than twenty-eight to thirty years. Petitioner said that he then requested to go to trial. Petitioner testified that trial counsel brought his mother with him to discuss the plea offer. He said that trial counsel also told him that he would be convicted if the case went to trial and that they argued about the evidence and the jail phone calls for "an hour to two[.]" Petitioner said that this made him feel pressured to take the offer. He did not feel that trial counsel was prepared for trial, and he felt that trial counsel was "appointed" to him but not representing him.

Petitioner testified that trial counsel knew that Petitioner was on medication at the time of the guilty plea submission hearing. He said that initial counsel told him that trial counsel was going to request that Petitioner undergo a mental health evaluation. However, Petitioner never had an evaluation.

On cross-examination, Petitioner agreed that he had been released on his "own recognizance" at the time of the homicide in the present case for two aggravated assault charges in another case. He ultimately pled guilty to those charges. Petitioner claimed that he did not fully understand what he was doing when he pled guilty to the offenses. He admitted that he had been charged on several occasions with offenses as a juvenile, and he had been adjudicated delinquent on multiple offenses.

- 4 -

Petitioner agreed that initial counsel explained the nature of the charges that he was facing in the present case and the possible punishment involved with the charges. He agreed that he was charged with first degree felony murder as well as first degree premeditated murder. Petitioner testified that trial counsel also discussed the nature of the charges with him on the day of his guilty plea. He agreed that trial counsel discussed the "pros and cons" of going to trial. They also discussed the evidence and the jail phone calls. Petitioner testified that he received a copy of discovery from initial counsel, and he was aware that the State would call many witnesses, including police officers, to testify as to how the victim died, and there were photographs that would be introduced. Petitioner agreed that he had reviewed the discovery packet, and he knew what the State claimed had occurred. Petitioner testified that he knew approximately one week before he pled guilty that Mr. Bailey, who was listed as the State's witness, had not been transported from federal custody to testify at trial. He was aware that Mr. Bailey had given a statement shortly after the homicide indicating that Petitioner came to his house the morning after the homicide with a gun. Mr. Bailey had also told the officers that Petitioner admitted to killing the victim, but made it sound like an accident. Mr. Bailey's statement was included in the discovery packet.

Petitioner testified that he was aware from discovery and from the preliminary hearing evidence of a call that was alleged to have been made to the taxi company which resulted in the victim being dispatched to the area where he was shot. The telephone number from that call was written on a piece of paper found inside the victim's taxi. Petitioner was aware that Detective Mosley, who had previously wanted Petitioner to work as a confidential informant, had said that Petitioner called him from the same telephone number, and Petitioner said that someone else murdered the victim. Detective Mosley was listed as a witness for the State at trial.

Petitioner testified that he was arrested on October 31, 2012, and the phone calls to his mother from the jail began on November 2, 2012, and continued through November 6, 2012. He also spoke with his girlfriend, Indonesia Suggs, during some of the calls. Petitioner asserted that he and his mother talked about many things during the calls including what was said during Petitioner's interrogation. Petitioner admitted that he "confessed his part" in the crimes during the interrogation; however, he denied telling his mother about the shooting. Petitioner testified that trial counsel allowed him to listen to the recordings of one or two of the phone calls between him and his mother.

Petitioner testified that he argued with his mother and trial counsel approximately one to two hours about what to do in his case. Petitioner asserted that he ultimately pled guilty because he felt pressured to do so by trial counsel and his mother. He said that his mother sat in the front row of the courtroom during the guilty plea submission hearing. Petitioner agreed that he and trial counsel reviewed the guilty plea petition before Petitioner signed it, but Petitioner claimed that he did not understand the plea because he was so angry at the time and scared for his life. However, he understood that he was

pleading guilty to second degree murder with a twenty-six-year sentence at one hundred percent but that he could receive eighty-five percent. Petitioner agreed he was placed under oath at the guilty plea submission hearing, he told the trial judge that he was on a couple of medications, and he answered all of the judge's questions. He never told the trial judge that he did not want to plead guilty, that he wanted a new attorney, or that he felt pressured to plead guilty.

Trial counsel testified that he has been licensed to practice law since October 2009, and approximately fifty to sixty percent of his cases at the time he took over Petitioner's case involved criminal defense work. Trial counsel spent the first couple of months after he took over Petitioner's case familiarizing himself with the case file. He met with Petitioner in March, once in July, and a number of times in August. They also spoke by phone many times. Trial counsel testified that he and Petitioner communicated well, and Petitioner understood his charges and the facts of the case. Trial counsel thought he had a good working relationship with Petitioner, and he initially thought that the State's case against Petitioner was very weak. However, trial counsel's perception of the case changed after the jail phone calls were discovered. He said that he first became aware that Petitioner was taking "mood disorder medication" when Petitioner mentioned it at the guilty plea submission hearing.

Trial counsel testified that he reviewed discovery received from initial counsel and noticed that there were one or two things missing from the file, such as the ballistics report and another interview. Trial counsel said that the State had offered open file discovery so trial counsel met with the prosecutor on August 3, 2015, to review the material. He did not believe that initial counsel had taken advantage of the State's offer. Trial counsel testified that he "found about 11 disks of various interviews and a few other reports, [and] the ballistics report[.]" Contained in the eleven disks was one labeled "jail calls" and it had a series of phone calls made from November 2 until November 6, 2012, between Petitioner and his mother. He did not specifically remember the calls between Petitioner and his girlfriend. Trial counsel immediately became concerned about the calls. He noted that some of the calls were irrelevant to Petitioner's case. Trial counsel further testified:

> [Petitioner] was talking about family, friends[,] life. There were some that referenced specifically conversations in the interview. So talking about, well the detectives said this or that. Things that happened during the interview that my gut feeling was that those could definitely be excluded under the fruit of the poisonous tree argument, I don't want to say definitely, but I - -
>
> *    *    *

- 6 -

I would have litigated that. I had a very strong argument for that. The third category of calls, and some of them were conversations mixed in with other calls or on totally separate calls were conversations with [Petitioner] and his mother where they were just talking about the - - were talking about the crime shortage. [sic] And they weren't talking about the interview. They weren't talking about the context of the interview the detective said this remember when I said that or this. It was just sort of - - his mom said something about, you know sympathy for the family and he would make a statement. So there were three or four things that you said that I thought were particularly bad. He acknowledged.

He said that the - - that they had the money wrong. That they were claiming he only got $12. He said that he got a lot more than $12. That he went to a hotel for a few days with his girlfriend. That was really concerning for me.

At one point, he said that he felt really bad about what he had done. And at another point he said that they hadn't - - it was something to the [e]ffect of they hadn't found the shooter, it was [a] guy named Mud Cat. And there may have been one or two other little things. And I had some notes - - so more specific notes, but those are really the kind of three big things that stood out to me that in my mind were - - and they weren't even things his mother said. His mother said some other things about you need to take responsibility, you need [to] go and - - if you need to lay down for a little while, you need to do it, think about his family and - - I mean, she was talking about pretty serious stuff, it wasn't as bad as the interview. But in my mind[,] it was - - it put him at risk for being convicted of possibly felony murder under a criminal responsibility theory.

So that - - to immediately - - almost immediately I went and met with [Petitioner], we listened to those jail calls specifically. We started talking about how that changed the strength of our case.

Trial counsel testified that he and Petitioner had at least three or four meetings in the jail about the phone calls. He said that Petitioner asked him to file a motion to suppress the calls. He also noted that Petitioner was very frustrated because he found out about the jail phone calls three or four weeks before trial, and Petitioner was frustrated that initial counsel had not found out about the calls earlier. Trial counsel testified that he told Petitioner that there was no legal basis for an independent motion to suppress based on the phone calls because the conversations were between Petitioner and his mother and that there was "no agency relationship" because the police were not involved in the calls.

Trial counsel testified that he did not feel that the phone calls would qualify as fruit of the poisonous tree. He further testified:

> I will say that in hindsight and retrospect and thinking about it today, candidly there may have been an argument if his arrest was only based off of that jail [sic].

> Viewing that may be the - - or that police interview that was suppressed, that may have been a fruit of a poisonous tree. So maybe that could have been a mistake. So I will say that. And I didn't file a motion to suppress based on that. I know that's not actually what you wanted to hear, but my analysis at the time was that there was other evidence in the case possibly the Derrick Bailey thing, the phone like you are talking about and that his phone calls with his mother after he was in jail were attenuated from the - - his - - his interview. There was no police officer standing over her putting her in the room like they were in - - in the suppressed [sic] interview. And so I thought there was a pretty good chance those were coming in.

Trial counsel testified that he filed motions in limine to redact the jail calls and to exclude the portions of the calls that were irrelevant and that made any reference to the suppressed interviews. The motions were filed before Petitioner entered his guilty plea.

Trial counsel testified that he and Petitioner had extensive discussions about the jail calls and "what parts of them might come in, what parts of them might not come in. Because I thought there was a distinction." Trial counsel further testified: "I thought there were enough pieces of them that would come in that were - - could be very problem[atic] and could be used against them. And [Petitioner] saying incriminating things that were not in reference to the interviews that would maybe - - or very likely give him a chance of being convicted." Trial counsel testified that after he learned of the jail calls, he told Petitioner that the State's case against him was "still not spectacular [.]" It was trial counsel's impression that the State never thought that Petitioner was the shooter. Trial counsel testified: "So that gave us a little bit of leverage to try to negotiate something that wasn't like 40 years and might be a little bit better." Trial counsel recalled making a plea offer to the State of fifteen years at one hundred percent. He thought that the State's counter-offer was thirty-five years. Trial counsel testified that Petitioner "wavered a lot between I want to go to trial no matter what, to I will take - - if it's anything more than 20, I will - - I will - - I'm going to trial to, I will take up to 25 [years]." Trial counsel testified that he was preparing for trial during the entire time of the plea negotiations. He said that he felt comfortable going to trial despite the number of witnesses and the amount of evidence against Petitioner. Trial counsel testified that "the really substantial evidence against him was - - there wasn't a lot of it and it was all stuff that we were sort of comfortable and familiar with and could be dealt with." He felt

that there was "a lot of risk" for Petitioner, and he expressed his concerns to Petitioner "a lot."

Trial counsel testified that he called Petitioner's mother after he listened to the jail calls and asked her about them. He again noted that Petitioner's mother was listed as a State's witness. Trial counsel testified:

> But even if the jail calls were kept out and she was brought in to testify about statements he made, that was another concern. I don't know what - - if she would have, but she - - as soon as I said, hey, they have jail calls. She said, I know exactly what you are talking about. He needs to work out a deal. So she was very concerned about it. She did come when exactly [Petitioner] said. She came to the last - - I think it was our motion day before the trial, so that Thursday before. And she asked to talk to him. I think it was her idea.

> And I will say - - and this is something I have very mixed feelings about. She did get a little up in his face and maybe that's putting it lightly. I mean, she put a lot of pressure on him to say, you know, I want to see you again. And I know what those jail calls say. I know what a jury is going to think. Save your life, all of that sort of stuff.

> And you know, I think there was some pressure there. But [Petitioner] also - - you know his frustration in a lot of ways, my impression was almost directed more at the fact that he wasn't getting the evidence until very late and that it should have been - - should have gotten it earlier. But it was somehow like hide the ball. And so he was very angry and upset about that. And we were trying to sort of parse out that frustration verses the fact that, you know, look this is something separate and apart from your interview.

> And ultimately, the 26th - - and I have some notes about this that we came down on, was I think your [prosecutor] and [my] conversation was that you were at 30 and you kind of said to me if you bring me a signed plea petition, we might be able to get it done. And [Petitioner] himself said I'll do 26 and so we put 26 on paper and he signed it and was okay with it.

> And I think that's how the last kind [sic] of few minutes went. And there was - - it was a hot moment. There was a lot of pressure there in the moments leading up to it. But ultimately at the end of the day, my impression was that he - - I think he had heard those jail calls and he knew that risk. He didn't like it. He was very frustrated by the few

- 9 -

weeks when we knew about the jail calls how that changed. You know, he had maybe - - I don't know when the Court's order on the suppression hearing came down, but you know eight, nine months maybe a year when he thought this case was in the bag. And all of the sudden it's sort of upside down on him. But I think - - I really do think in the last minute that he understood that that was in a lot of ways his best, just because there was such a big risk of going to trial.

Trial counsel believed that Petitioner understood the questions asked by the trial court during the guilty plea submission hearing. He also thought that Petitioner entered the guilty plea knowingly and voluntarily. He said: "I think he voluntarily did it and I think he did it after a lot of discussion about the circumstances and what was the best thing to do with his case." Trial counsel did not recall Petitioner asking him to file a motion to withdraw his guilty plea.

On cross-examination, trial counsel reiterated that he thought the remaining evidence against Petitioner was weak and that the State had a relatively weak case against Petitioner outside of the police interrogation and the jail phone calls. When asked what his trial strategy would have been, trial counsel testified that "there was Derrick Bailey who was a listed witness and I don't have records of him being transported, but it was represent[ed] to me and it was my impression that he was going to be brought in as a witness." Trial counsel asserted that Mr. Bailey's statement was harmful to Petitioner's case; however, Mr. Bailey was not a "very compelling witness himself." He noted that Mr. Bailey had an extensive criminal record and that "there was [a] lot of fertile ground for cross-examination with him."

Trial counsel testified that there were also grounds to attack the phone call that was made to the cab company from the phone number that Petitioner also used some hours after the murder. Trial counsel did not believe that the phone call itself was enough to convict Petitioner because he thought that the caller was a female. Trial counsel felt that the case against Petitioner, other than the jail calls, was mostly circumstantial. He was comfortable that there was an opportunity for reasonable doubt in Petitioner's case in terms of the jury deliberations. Trial counsel testified: "But I thought we had - - we had defenses that could be raised. I thought there was."

Trial counsel agreed that the jail phone calls changed his analysis of Petitioner's case. He felt that any statements made during the calls that pertained to the suppressed interrogation would have been covered by the suppression order entered by the trial court, which was referenced in trial counsel's motion in limine. Trial counsel did not know if Petitioner's arrest was based solely on the interrogation. He did not believe that he and Petitioner discussed whether that would have been a ground for a second suppression motion. Trial counsel testified that he and Petitioner discussed the fact that the jail calls were not prompted by law enforcement and that some of the conversations would not

- 10 -

have been "fruit of the poisonous tree if they weren't talking about the interview." Trial counsel testified that he did not extensively research the issue of whether or not the jail calls should have been suppressed. Trial counsel did not recall if he considered asking the trial court for a continuance to research the issue.

Trial counsel admitted that it was rare for a defendant's parent to come into the "booth" with him to speak with a defendant. He said that the conversation that Petitioner's mother had with him bordered on making trial counsel uncomfortable. Trial counsel testified that his recollection was that "this was a situation where [Petitioner] and his mom were talking about the case a lot." He said that Petitioner and his mother had a close relationship, and she was an advocate of his accepting a plea offer. When asked if Petitioner's mother was brought into the booth because Petitioner did not want to accept a plea offer, trial counsel testified:

> I - - I don't know that she was in the booth just because he said that he didn't want to take a plea necessarily. I think that she was just helping to talk him through it generally. I don't think we were - - at that point, had anything close to numbers that either of us thought were okay. I think the State was on 35, maybe a 30, which wasn't going to happen. It was just whether or not we were even going to have a negotiation.

Trial counsel thought that getting Petitioner's family's input would be helpful for his decision-making process. He did not feel that any of the medications that Petitioner was taking at the time prevented Petitioner from understanding what he was doing. Trial counsel noted that Petitioner was probably a range-two offender and that even if he was convicted of second-degree murder rather than first-degree murder at trial, he still faced a sentence of twenty-five to forty years.

*Analysis*

Petitioner contends that had trial counsel been prepared for trial and filed a motion to suppress the recordings of his jail calls with his mother he would not have entered a guilty plea and would have proceeded to trial. He further contends that trial counsel and his mother pressured him into entering the guilty plea.

To obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C.A. § 40-30-103; *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004).

A petitioner has a right to "reasonably effective" assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 9 of the

Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to effective assistance of counsel is inherent in these provisions. *Strickland v. Washington*, 466 U.S. 668, 685-86); *Dellinger*, 279 S.W.3d at 293. When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland*, 466 U.S. at 687; see *Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). Failure to satisfy either prong results in the denial of relief. *Strickland*, 466 U.S. at 697.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). Furthermore, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e. a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In the context of a guilty plea, the petitioner must show a reasonable probability that were it not for the deficiencies in counsel's representation, he or she would not have pled guilty but would instead have insisted on proceeding to trial. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *House v. State*, 44 S.W.3d 508, 516 (Tenn. 2001).

In addition, in determining the voluntariness of a guilty plea, a trial court must advise the defendant of the consequences of a guilty plea and determine whether the defendant understands those consequences to ensure the plea is a "voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970); *see also Boykin v. Alabama*, 395 U.S. 238, 244 (1969). The trial court must address the defendant personally in open court, inform the defendant of the consequences of the guilty plea, and determine whether the defendant understands those consequences. *See State v. Mackey*, 553 S.W.2d 337, 341 (Tenn. 1977), *superseded on other grounds by rule as stated in State v. Wilson*, 31 S.W.3d 189, 193 (Tenn. 2000); Tenn. R. Crim. P 11(c). The trial court looks to the following factors in determining whether the defendant's guilty pleas were knowing and voluntary:

> the relative intelligence of the [petitioner]; the degree of his familiarity
> with criminal proceedings; whether he was represented by competent
> counsel and had the opportunity to confer with counsel about the options
> available to him; the extent of advice from counsel and the court
> concerning the charges against him; and the reasons for his decision to

plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993).

Our supreme court has stated that:

> [T]he petitioner for post-conviction relief [ ] has the burden of proving his factual allegations by clear and convincing evidence. *Calvert v. State*, 342 S.W.3d 477, 485 (Tenn. 2011) (citing *336 Tenn. Code Ann. § 40-30-110(f) (2006) and Tenn. Sup. Ct. R. 28 § 8(D)(1)). The factual findings of the post-conviction court are binding on an appellate court unless the evidence in the record preponderates against those findings. *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009). The post-conviction court's application of law to its factual findings is reviewed de novo with no presumption of correctness. *Calvert*, 342 S.W.3d at 485. A claim of ineffective assistance of counsel presents a mixed question of law and fact that is subject to de novo review with no presumption of correctness. *Id.*; *Dellinger*, 279 S.W.3d at 294; *Pylant v. State*, 263 S.W.3d 854, 867 (Tenn. 2008).

*Smith v. State*, 357 S.W.3d 322, 335-36 (Tenn. 2011).

"Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)).

In this case, the post-conviction court made extensive findings concerning trial counsel's failure to file a motion to suppress the jail calls. The post-conviction court pointed out that while trial counsel did not file a motion to suppress the calls, he filed a motion in limine to exclude the portions of the calls during which Petitioner made reference to what he said in the police interrogation that had been suppressed pursuant to an earlier suppression motion filed by initial counsel. The post-conviction court concluded: "Thus, [trial counsel] was not ineffective for failing to deal with that category of jail calls." The post-conviction court further found:

> Accordingly, the question before the Court is whether [trial counsel] was ineffective because he failed to file a motion to suppress the jail calls in which Petitioner made independent statements about the incident. After consideration of this issue, the Court finds that [trial counsel's] failure to take this action does not rise to the level of deficient performance. Both federal and Tennessee courts recognize that the question of deficiency

- 13 -

revolves around whether the attorney's actions are outside of a range of competency. By its very nature, this range can be difficult to define. *See Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)(discussing variability of "range of competence" standard). To aid in making this determination, although not binding, the Court finds persuasive the guideline used by the [Sixth] Circuit Court of Appeals to evaluate whether an attorney was deficient for failing to file a motion to suppress. According to that test, while a "single, serious error," such as a "failure to file a plainly meritorious motion to suppress," can constitute deficient performance, such a failure "does not constitute *per se* ineffective assistance of counsel." *See Hendrix v. Palmer*, 893 F.3d 906, 922 (6th Cir. 2018). In order for such a failure to rise to the level of deficient performance, "the meritorious nature of the motion must be so plain that 'no competent attorney would think a motion to suppress would have failed.'" Id. (quoting *Premo v. Moore*, 562 U.S. 115, 124 (2011).

In light of this standard, the Court finds that [trial counsel's] failure to file a motion to suppress the independent statements about the incident from the jail calls did not constitute deficient performance. The Court recognizes that [trial counsel] could have filed a motion to suppress all of the Petitioner's jail calls based on the argument that they were fruit of the poisonous tree, and that motion clearly would not have been frivolous. However, while such a motion could have been filed, the Court is not of the opinion that such a motion would have been so "plainly meritorious" that "no competent attorney would think [that] motion would have failed." *Id*. The Court still has questions about whether the Petitioner's arrest and detention was solely based on his statements from the suppressed interrogation, as is discussed below in the Court's analysis of the prejudice prong. However, even if the Court were to accept the Petitioner's belief that he would not have been arrested but for his suppressed statements in the interrogation, the Court is of the opinion that the issue of attenuation would still be subject to reasonable debate. *See Utah v. Strieff*, 136 S.Ct. 2056, 2061 (2016) (noting that under the doctrine of attenuation, evidence that is arguably the fruit of the poisonous tree is still "admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstances"). Because the Court is of the opinion that the issue of attenuation would be subject to debate even if the jail calls were otherwise fruit of the poisonous tree, the Court cannot find that a motion to suppress those calls was "plainly meritorious" such that [trial counsel's] failure to file such a motion constituted deficient performance.

- 14 -

The post-conviction court further found that Petitioner failed to show that he was prejudiced by trial counsel's failure to file a motion to suppress the jail calls. The post-conviction court concluded:

> Turning to the matter at hand, even if the Court were to accept the Petitioner's legal theory that the jail calls should be suppressed as fruit of the poisonous tree under certain circumstances, the Petitioner has still failed to establish that he was prejudiced by [trial counsel's] failure to file such a motion. This is because the Petitioner has failed to prove by clear and convincing evidence that such a motion would have been granted. The Petitioner's theory is based on his assumption, which he testified to, that he would have been arrested in the case but for the statements he made in the interview which was subsequently suppressed. In support of that assumption, the Petitioner testified that he thought that was the case because he was not arrested until after the interview. While the Court understands the logic of this inference to some extent, the Court cannot find that this inference establishes the fact in question by clear and convincing evidence. It is common practice for law enforcement officers to question suspects before taking out arrest warrants in order to help a suspect lower their guard and be more willing to speak. Thus, in the absence of additional proof from law enforcement officials involved in securing the arrest warrant, the Court is not of the opinion that the fact the Petitioner was arrested shortly after he made his statement established by clear and convincing evidence that the Petitioner would not have been arrested but for the suppressed interviews. Accordingly, the Court finds that the Petitioner had failed to establish that he was prejudiced by [trial counsel's] failure to file a motion to suppress the jail calls. Thus, the Petitioner is not entitled to relief on this ground.

The record does not preponderate against the post-conviction court's findings. It is well settled that when a Petitioner in post-conviction proceedings asserts that counsel rendered ineffective assistance of counsel by failing to call certain witnesses to testify, or by failing to interview certain witnesses, these witnesses should be called to testify at the post-conviction hearing; otherwise, Petitioner asks the Court to grant relief based upon mere speculation. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. 1990). The same standard applies when a Petitioner argues that trial counsel was constitutionally ineffective by failing to file pretrial motions to suppress evidence. In order to show prejudice, Petitioner must show by clear and convincing evidence that (1) a motion to suppress would have been granted and (2) there was a reasonable probability that the proceedings would have concluded differently if counsel had performed as suggested. *Vaughn v. State*, 202 S.W.3d 106, 120 (Tenn.2006) (citing *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064-65). In essence, the Petitioner should incorporate a motion to suppress within the

proof presented at the post-conviction hearing. If trial counsel had filed the motion to suppress evidence that Petitioner claims should have been filed, there is no evidence in the record to justify granting the motion. In *Terrance Cecil v. State*, No. M2009-00671-CCA-R3-PC, 2011 WL 4012436, at \*8 (Tenn. Crim. App., Sept. 12, 2011), in the context of a warrantless search, a panel of this Court stated: "On issues such as the ones in the case *sub judice,* it is likely a rare occasion indeed when the testimony of only the Petitioner and the trial counsel could provide proof of the merit of a suppression motion based upon a warrantless search." Thus, based upon the entire record before this Court, which consists of only testimony by Petitioner and trial counsel, it would require pure speculation to conclude that a motion to suppress the jail calls in Petitioner's case would have been granted. Petitioner has not proven his allegations of fact concerning this issue by clear and convincing evidence. Petitioner has failed to prove that trial counsel rendered deficient performance or that any deficiency caused him prejudice on this ground.

Of further note, we reject the post-conviction court's reliance upon *Hendrix v. Palmer*, 893 F.3d 906, 922 (6th Cir. 2018) to authorize what appears to be a new test for a state court to determine whether failure to file a pretrial motion to suppress evidence rises to the level of deficient performance. We hold the *Hendrix* test is much too restrictive, requiring a finding that "no competent attorney would think [the] motion to suppress would have been filed." The better test is the one well established in Tennessee for determining deficient performance. As set forth above, deficient performance is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369, (citing *Strickland*, 466 U.S. at 688; *Baxter*, 523 S.W.2d at 936).

Even though the post-conviction court erred by applying the *Hendrix* test, that does not affect the ultimate result reached by the trial court. The record is void of any proof showing the merit of a motion to suppress the recorded jail calls. In fact in his appellate brief, Petitioner's post-conviction counsel states:

> As stated during argument [in the post-conviction court] in support of the petition for post[-]conviction relief, counsel has not been able to find any case law directly on point supporting the proposition that recorded jail calls following an illegally obtained confession are themselves suppressible.

Petitioner further asserts that trial counsel should have filed a motion for a continuance to have more time to consider and research the issue of the jail calls. Concerning this issue, the post-conviction court found:

> [Trial counsel] indicated that he did not file a motion to suppress the portions of the jail calls at issue not because he did not have enough time

before trial, but because he did not believe that there was a basis to do so. The Petitioner was incarcerated awaiting trial and never requested [trial counsel] seek to continue the case. [Trial counsel] assessed the possibility of filing a motion to suppress the independent portions of the jail calls but did not do so because he did not believe there was a justification for suppressing the calls. In light of these facts, in the same vein as the Court's ruling on whether [trial counsel] should have filed a motion to suppress, the Court is not of the opinion that [trial counsel's] failure to file a motion to continue the trial fell below the range of competency. Further, just as with the Court's analysis of whether [trial counsel] should have filed a motion to suppress, the Court also finds that the Petitioner has failed to establish that he was prejudiced by [trial counsel's] decision not to seek a continuance to file such a motion because the Petitioner has not established that he would have been successful on that motion. Thus, the Petitioner is not entitled to relief on this ground.

Again, the record does not preponderate against the post-conviction court's findings concerning this ground for relief. Petitioner has not demonstrated that a motion to continue would have been granted. Additionally, Petitioner has not shown or alleged in his brief how a continuance or additional research would have changed the outcome of Petitioner's case. As noted above, in Petitioner's brief, post-conviction counsel admits that he was unable to find "any case law directly on point supporting the proposition that recorded jail calls following an illegally obtained confession are themselves suppressible." *See Owens v. State*, 13 S.W.3d 742, 756 (Tenn. Crim. App. 1999)("[f]or purposes of proving an ineffective assistance of counsel claim, proof of deficient representation by omission requires more than a speculative showing of a lost potential benefit").

Furthermore, the post-conviction court accredited trial counsel's testimony that he was prepared for trial. At the post-conviction hearing, trial counsel testified that he was preparing for trial during the entire time of the plea negotiations. He felt comfortable going to trial despite the number of witnesses and the amount of evidence against Petitioner. Therefore, no continuance was needed. Petitioner has failed to prove that trial counsel rendered deficient performance or that any deficiency caused him prejudice on this ground.

Finally, Petitioner argues that he was pressured into pleading guilty because trial counsel brought Petitioner's mother into the booth with him and that she talked with Petitioner for one to two hours. He asserts that the "end result of her presence in the booth with his attorney was that he 'felt like [he] was pressured to plead guilty.'" Concerning this ground for relief, the post-conviction court concluded:

However, the Petitioner's primary argument is not focused on his understanding of the plea, but on his claim that he did not enter into the plea agreement voluntarily because of pressure from [trial counsel] and his mother. Ultimately, while the Court recognizes that the Petitioner may not have been happy about entering the instant plea and his mother and [trial counsel] may have counseled him that taking the plea would be advantageous, the Court finds that the plea was entered into voluntarily. The Court has considered the testimony regarding the conversations between the Petitioner, his mother, and [trial counsel] on the day the plea was entered. The Court also recognizes that [trial counsel] indicated that those discussions were uncomfortable, given the fact the Petitioner's mother was very clear about her desire for the Petitioner to reach a plea agreement and not risk exposure to a possible life sentence. However, in spite of that pressure, [trial counsel] also testified that he still believed the Petitioner entered this plea voluntarily. The Court agrees with this assessment. Every individual who enters a plea agreement faces some degree of external pressures, whether it be through family's needs or desires, advice of counsel, or a desire to avoid exposure to a greater possible sentence. While the Petitioner's mother was particularly vocal in expressing her opinion about the case, the Court is not persuaded that advice from either the Petitioner's mother or [trial counsel] resulted in the Petitioner's will being overborne such that the Petitioner's plea was not voluntary.

The post-conviction court also noted that that the plea colloquy "strongly supports a finding that the Petitioner's plea was entered into voluntarily." The court further concluded: "Perhaps most importantly, when asked if he was being forced in any way to enter the plea, the Petitioner stated that he was not."

The record supports the post-conviction court's findings. Trial counsel testified that Petitioner and his mother had a close relationship, and his mother asked to talk with him. Trial counsel agreed that she pressured Petitioner to accept a guilty plea. However, trial counsel testified that he thought Petitioner entered the plea knowingly and voluntarily. He said: "I think he voluntarily did it and I think he did it after a lot of discussion about the circumstances and what was the best thing to do with his case." At the guilty plea submission hearing, the trial court asked Petitioner the following question: "Is there anyone forcing you in any way to enter this particular plea?" Petitioner replied: "No." Petitioner also told the trial court that no one had promised him anything, and he did not have any questions. At the post-conviction hearing, Petitioner admitted that he never told the trial court at the guilty plea submission hearing that he felt pressured to accept the plea. Petitioner has not proven his allegations of fact on this ground by clear and convincing evidence.

- 18 -

Petitioner has failed to show that his guilty plea was not knowingly, voluntarily, and intelligently made with the effective assistance of counsel. In our de novo review with no presumption of correctness to the trial court's ruling, we conclude that Petitioner failed to establish either deficient performance or prejudice if there had been deficient performance by trial counsel. Accordingly, Petitioner is not entitled to post-conviction relief.

## CONCLUSION

Based on the foregoing, we affirm the judgment of the post-conviction court.

_____
THOMAS T. WOODALL, JUDGE